## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JANSSEN PHARMACEUTICA N.V., and JANSSEN PHARMACEUTICA PRODUCTS, L.P. ) | |
| ) | Civ. Action No. 2:03-CV-06220 |
| Plaintiffs and Counterclaim ) Defendants, ) | |
| ) | |
| v. ) | Judge John W. Bissell |
| ) | |
| MYLAN PHARMACEUTICALS INC., ) | Magistrate Judge |
| ) | G. Donald Haneke |
| Defendant and Counterclaim. ) Plaintiff. ) | |
| | |
| JANSSEN PHARMACEUTICA N.V., and JANSSEN PHARMACEUTICA PRODUCTS, L.P. ) | |
| ) | Civ. Action No. 2:03-CV-06185 |
| Plaintiffs and Counterclaim ) Defendants, ) | |
| ) | |
| v. ) | Judge John W. Bissell |
| ) | |
| DR. REDDY'S LABORATORIES, LTD. and ) DR. REDDY'S LABORATORIES, INC., ) | Magistrate Judge G. Donald Haneke |
| ) | |
| Defendants and ) Counterclaim Plaintiffs. ) | |

## Expert Report of Edmond J. LaVoie, Ph. D.

1.    I expect to testify as an expert witness for the defendants in Janssen Pharmaceutica N.V. et al. v. Mylan Pharmaceuticals, Inc., Civil Action No. 2:03 CV-06220 and Janssen Pharmaceutica N.V. et al. v. Dr. Reddy's Laboratories, Ltd. et al., Civil Action No. 2:03-CV-06185.  This report describes my expected affirmative testimony.  To date, I have not made any exhibits that provide a summary of my opinions.  I am being compensated for my work in connection with this matter at the rate of $250 per hour.

2.    I have testified as an expert at trial or deposition in the following cases within the preceding four years:

A.    Novartis Pharmaceuticals Corp. et al. v. Dr. Reddy's Laboratories, Ltd. et al., Civil Action No. 02-CV-5560, United States District Court for the Southern District of New York; and

B.    Eli Lilly and Company et al. v. Zenith Goldline Pharmaceuticals et al., Civil Action No. IP 01-0443-C-Y/S, United States District Court for the Southern District of Indiana.

### PROFESSIONAL BACKGROUND AND QUALIFICATIONS

3.    Medicinal Chemistry is a well-established scientific discipline which concerns the design, discovery and development of chemicals for use as medicinal drugs. I have been privileged to devote the past 30 years of my professional career to studying and working in this field.

4.    I am presently the Chair of the Department of Pharmaceutical Chemistry and a tenured Professor of Medicinal Chemistry at Rutgers, The State University of New Jersey. I received a Ph.D. in Medicinal Chemistry from the State University of New York at Buffalo in 1975. Thereafter, I spent one year as a postdoctoral research fellow at the University of Virginia, and then twelve years at the Naylor Dana Institute for Disease Prevention, where I served as a section head. I joined the faculty of Rutgers University in the Department of Pharmaceutical Chemistry in 1988. For the past seventeen years, I have taught medicinal chemistry at the undergraduate level to senior pharmacy majors. During that time, I also taught graduate level courses on drug structure, function, design, and metabolism. My lectures have covered the topic of antipsychotics.

5.    I have served as an expert reviewer of applications for research grants for both the American Cancer Society and the National Institutes of Health ("NIH"). The NIH

awarded me their Merit Award, which fully funded my research for ten years. My research during that time period, and for the past 30 years, confronted a range of issues, including the mechanism of cancer causation, the design and study of several novel anticancer agents, and the development of a novel class of "topoisomerase I" targeting agents for clinical use.

6.  My scientific findings have been published more than 185 times in peer-reviewed scientific journals, and are the subject of nine issued United States patents. My *curriculum vitae*, attached at Tab 1, contains further information regarding my background and qualifications, including a list of my publications and patents.

7.  In my capacities as the Chair of the Department of Pharmaceutical Chemistry and as a Professor of Medicinal Chemistry at Rutgers University, and throughout my professional career, I have worked with, supervised, instructed, and taught individuals of all levels of skill in the field of Medicinal Chemistry. Individuals in this field typically rely on the techniques of drug discovery and organic chemistry, among others.

## BASIS FOR OPINION

8.  In forming the conclusions and opinions expressed in this expert report, I relied on my 30 years of experience in the field of Medicinal Chemistry and my review of the materials listed in Tab 2.

9.  It is my understanding that any reference or publication dated prior to March 27, 1984 is prior art to United States Patent No. 4,804,663 ("the '663 patent"; Tab 3).

## STATEMENT OF OPINIONS

### I.    Methodologies of Pharmaceutical Research and Development

10.  At the time period relevant to this case, as today, the methodology of pharmaceutical research and development typically comprised two stages. In the "lead

3

identification" stage, medicinal chemists identified one or more lead compounds. The search for a lead compound often involved screening a large number of compounds in order to identify those possessing a desired activity. Sometimes, lead identification was accomplished through serendipity (*e.g.*, discovering a desirable side effect of a drug intended to treat another ailment).

11. Once one or more lead compounds was identified, the second stage of drug development consisted of modifying the structure of the lead compound(s) to create new compounds having improved activity profiles. The "lead following" stage thus comprised the synthesis and testing of numerous structural analogs of the lead compound(s). In contrast to the serendipity and randomness that often characterized the lead identification stage, the lead following stage typically involved rational selection strategies.

12. By rationally selecting the modifications to be made to the lead compound(s), those of ordinary skill in the art hoped to improve their odds of discovering amongst the new compounds one or more having properties superior to those of the lead compound(s). That hope was reasonably based, in part, on the fact that the properties of structurally similar compounds are often similar (though rarely identical). Consequently, those of ordinary skill in the art might have expected that a new compound that was structurally similar to the lead compound(s) would have a spectrum of properties similar to those of the promising lead compound(s), but have some differences in properties that would possibly make the new compound superior to the lead compound(s).

13. Those of ordinary skill in the art were guided by several basic chemical principles in their selection of new compounds for synthesis and testing. Most fundamentally, they were guided by the fact that even the most complex compound can be thought of as a

4

combination of smaller parts, with the parts being collectively responsible for the properties of the compound as a whole. By understanding complex compounds as collections of interchangeable parts, those of ordinary skill in the art were able to understand, and thereby to predict, biological activity in terms of these parts.

14. When those of ordinary skill in the art determined that one or more parts were associated with one or more properties, they termed the association a "structure-activity relationship" ("SAR"). A general method of uncovering SARs was to systematically vary each component part of the lead compound(s), in order to determine which parts were important to activity, and which were not. That systematic variation was sometimes guided by two other chemical principles – isosterism and bioisosterism.

15. The similarity in size and shape of some chemical parts is known as isosterism. The similarity in size, shape, and biological activity of some chemical parts is known as bioisosterism. Those of ordinary skill in the art sometimes used isosteres or bioisosteres of a lead compound's parts to create new compounds. For example, if the only difference between a lead compound and a new compound was that the latter contained an isostere or bioisostere of a corresponding part of the lead compound, those of ordinary skill in the art expected the resulting compound to have approximately the same size and shape of the lead compound. Consequently, they could deduce that any differences in the compounds' properties were due to differences other than size or shape (e.g., electronic factors, physical chemical properties, or differences in metabolic fate). That knowledge, in turn, could guide the selection of new compounds for chemical synthesis and biological or pharmacological testing.

16. The Medicinal Chemist also frequently uses structure-activity data from two differing classes of compounds that possess similar biological activity. By examining

5

differences and similarities in structure, one envisions hybrids which potentially will exhibit the desired properties that have been observed in each individual class. In this manner the structure-activity relationships observed in both classes of compounds can be further refined and enhanced.

17.    A final important point is that the search for new compounds having improved properties is never-ending. Those of ordinary skill in the art are painfully aware of the fact that promising compounds often fail to fulfill their promise. More fundamentally, drugs typically have some properties which have the potential to be improved upon. Consequently, medicinal chemists are always in search of new drug candidates.

## II.    The Person of Ordinary Skill in the Art

18.    I understand from Reddy's counsel that in determining whether a claimed invention is an obvious variant of another invention, the law focuses on a hypothetical person of ordinary skill in the art pertaining to the claimed invention and on what knowledge he or she would have possessed at the relevant time, including the knowledge he or she could have gleaned from all the available references.

19.    In my opinion, with respect to the subject matter claimed in the '663 patent, the person of ordinary skill in the art would have had a graduate degree in a scientific discipline related to the research and development of pharmaceuticals, such as organic chemistry or medicinal chemistry. The person of ordinary skill in the art with a Ph.D. would have had at least one year of postdoctoral academic or industrial experience related to the synthesis of pharmaceuticals. The person of ordinary skill in the art with a Masters degree would have had at least three years of post-Masters academic or industrial experience related to the synthesis of pharmaceuticals.

6

## III.    Janssen's U.S. Patent No, 4,342,870

20.    United States Patent No. 4,342,870 ("the '870 patent"; Tab 4) issued to Janssen on August 3, 1982.  That patent was directed to a class of compounds referred to as "Novel 3-(1-piperidinylalkyl)-4H-pyrido[1,2-A]pyrimidin-4-one derivatives."

21.    The '870 patent singled out the compound 3-[2-[4-(4-fluorobenzoyl)-1-piperidinyl]ethyl]-2-methyl-4H-pyrido[1,2]pyrmidin-4-one as the most preferred within the class disclosed.  (*See* col. 2, ll. 35-37.)  Moreover, this compound was the only one specifically claimed in the patent.  (*See* claim 5.)  This compound is known as "Pirenperone."

22.    The specification of the '870 patent described the compounds claimed as "very potent serotoninantagonists" and stated that the compounds could be "used in the treatment of a variety of diseases in which serotonin release is of predominant importance."  (*See* col. 11, ll. 11-14.)  Thus, Pirenperone was disclosed in the '870 patent as a potent serotonin antagonist.

## IV.    State of the Art in the Early-1980s

23.    By the early-1980s, those working in the field of antipsychotics were still searching for a drug that was both effective in its ability to treat conditions such as schizophrenia while at the same time minimizing the side-effects that were seen with then-existing therapies.  Classical, or typical, antipsychotic drugs were well known to produce, in addition to their antipsychotic effects, a constellation of side-effects referred to as extrapyramidal symptoms or EPS.  Thus, research at the time focused on producing an antipsychotic drug with minimal EPS.

24.    At the time it was understood that for a drug to be effective as an antipsychotic, the drug had to bind to receptors for a brain chemical called dopamine. *See,*

7

*e.g.*, C. Creese, et al., "Dopamine Receptor Binding Predicts Clinical and Pharmacological Potencies of Antischizophrenic Drugs," *Science* 1976, 192: 481-483 ("Creese"; Tab 5). It was also theorized that there was a direct correlation between blockade of dopamine receptors in the brain and the tendency of typical antipsychotics to produce EPS.

25.    In 1972, clozapine was introduced as the first atypical antipsychotic. The advent of clozapine was significant because it was finally shown that it was possible to have in one drug an effective antipsychotic that produced little or no EPS. It was proposed that clozapine's lack of EPS might be due to its high degree of antiserotonin activity. *See* A. Sulpizio et al., "Antagonism of Fenfluramine-Induced Hyperthermia: A Measure of Central Serotonin Inhibition", *Life Sciences* 1978, 22:1439-1446 ("Sulpizio"; Tab 6). Indeed, work with other antipsychotics suggested that side effects associated with these drugs could be mitigated if these drugs also exhibited serotonin antagonism. *See, e.g.*, D. Goldman, "Treatment of Phenothiazine-Induced Dyskinesia," *Psychopharmacology* 1976, 47: 271-72 ("Goldman"; Tab 7); J.J. Balsara et al., "Effects of Drugs Influencing Central Serotonergic Mechanisms on Haloperidol-Induced Catalepsy," *Psychopharmacology* 1979, 62:67-69 ("Balsara"; Tab 8).

26.    Clozapine was eventually removed from the market in 1975[1] because it produced a potentially fatal blood disorder known as agranulocytosis in some of the patients taking the drug. Nevertheless, the experience with clozapine taught those working in the field that a multi-receptor drug – unlike the typical antipsychotics which acted primarily on dopamine receptors – was the key to an agent that exhibited potent antipsychotic activity with little or no EPS. Indeed, research published after clozapine had been withdrawn from the

---

[1] In 1989, the FDA approved the use of clozapine for treatment-resistant schizophrenia provided patients taking the drug underwent regular hematological monitoring.

8

market suggested that some antipsychotic drugs functioned as both serotonin antagonists as well as dopamine antagonists. *See, e.g.*, H. Lai et al., "Antiserotonin Properties of Neuroleptic Drugs," in: Psychopharmacology and Biochemistry of Neurotransmitter Receptors, Yamamura, Olsen, Usdin, eds., Elsevier North Holland, Inc., 347-353, 1980 ("Lai"; Tab 9); J.E. Leysen et al., "Serotonergic component of neuroleptic receptors," *Nature* 1978, 272: 168-171 ("Leysen"; Tab 10);. Thus, a person of ordinary skill searching for an effective antipsychotic in the early-1980s would have had as their goal an agent that functioned not only in affecting dopamine receptors, but also other receptors in the brain. In particular, the person of ordinary skill would have been interested in compounds that were potent serotonin antagonists, which research suggested tempered the EPS associated with the typical antipsychotic drugs.

## V.    Pirenperone

27.    As stated in ¶¶ 20-22, Pirenperone was disclosed in the '870 patent in 1982. Structurally, Pirenperone may be illustrated as consisting of two sides linked by a 1,2-ethandiyl, viz:

One side of the molecule is attached at the 3-position of a pyrido[1,2-*a*]pyrimidin-4-one. For convenience, one can refer to this as the "A-side" of the molecule. The other side of the molecule is connected at the 1-position of a 4-(4-fluorobenzoyl)piperidine, which one can refer to as the "B-side" of the molecule.

28.     As noted, the '870 patent suggested that Pirenperone was a potent serotonin antagonist.   In addition, various other publications reported the antiserotonin activity of Pirenperone.   *See, e.g.*, F.P. Colpaert and J.E. Leysen, "Characterization of *In Vivo* Agonist and Antagonist Activity of Purported 5-Hydroxytryptamine Antagonists and R 47 465, An LSD-Antagonist," 8th International Congress of Pharmacology, Tokyo, Japan, July 19-24, 1981 ("Colpaert"; Tab 11); L. Pawloski et al., "Antiserotonergic and Antidopaminergic Action of Pirenperone, A New $S_2$-Serotonin Receptor Antagonist," *Naunyn-Schmiedeberg's Arch. Pharmacol.*1983, 324 (Suppl.): R1-R86 ("Pawloski"; Tab 12); H.Y. Meltzer et al., "Effects of Pirenperone and Ketanserin on Rat Prolactin Secretion In Vivo and In Vitro," *European Journal of Pharmacology* 1983, 92: 83-89 ("Meltzer"; Tab 13).   Thus, by the early-1980s it was well known to those in the field that Pirenperone was a potent serotonin antagonist.

29.     In addition to its potent antiserotonin activity, it was also reported that Pirenperone had a high affinity for the dopamine receptor.   *See, e.g.*, Pawlowski; Meltzer; A.R. Green et al., "Inhibition of 5-Hydroxytryptamine-Mediated Behavior by the Putative 5-$HT_2$ Antagonist Pirenperone," *Neuropharmacology* 1983, 22: 573-578 ("Green"; Tab 14).

30.     Pirenperone was thus a multi-receptor agent that acted on both dopamine as well as serotonin receptors.   Nevertheless, a potential problem with Pirenperone as a clinical antipsychotic, as reported by Green, was its duration of action:

> Finally, it would appear that the effect of pirenperone is fairly short-lasting insofar as no inhibition of the quipazine-induced response was seen 6h after the administration of pirenperone.

Tab 14 at 577.

31.     Confronted with the fact that Pirenperone was short-acting, a person of ordinary skill would have attempted to determine the reason for its short duration of action. In doing so, a person of ordinary skill would likely have considered Pirenperone's metabolism or elimination.

32.     A particularly susceptible group to metabolic alteration is the keto-group incorporated within the "B-side" of the Pirenperone molecule.  It was well known that such ketones can be susceptible to metabolic reduction to secondary alcohols.  A person of ordinary skill would have known that such a metabolic transformation could enhance clearance or limit distribution of a therapeutic agent.  Ketanserin possesses a ketone moiety comprised of a 4-(4-fluorobenzoyl)-1-alkylpiperidine, which is structurally-identical to the "B-side" of Pirenperone. *See* ¶ 27, *supra*.  It was reported that this ketone moiety is extensively metabolized to "Reduced Ketanserin," and represents a major metabolite of Ketanserin present in human plasma.  *See* F. Lindelauf, "Determination of ketanserin and its major metabolite (reduced ketanserin) in human plasma by high-performance liquid chromatography," *J. Chromatography: Biomedical Applications* 1983, 277: 396-400 ("Lindelauf"; Tab 15).  Thus, it would have been recognized by a person of ordinary skill in the art that a ketone, such as that comprised of a 4-(4-fluorobenzoyl)-1-alkylpiperidine, would likely be susceptible to metabolic reduction.  Such susceptibility could reduce the distribution and duration of action of such a compound.  In fact, it had been suggested in a prior publication that the relatively short duration of molecules containing a ketone might be due to the metabolic reduction of the keto-group on those molecules to an alcohol.  *See* Pottier, J. et al., "Species Differences in the Biotransformation of 4-(2-methyl-3-(4-

chlorobenzoyl)phenyl)butanoic acid (RU 16029)," *Xenobiotica* 1978, 8: 429-437 ("Pottier"; Tab 16).

33.    Thus, the person of ordinary skill would have looked towards replacing the "susceptible" ketone on Pirenperone with a different moiety that would allow for retention of biological activity; i.e. a bioisostere.

## VI.    Strupczewski and 1,2-benzisoxazole Compounds

34.    Around the same time that the '870 patent issued, an abstract of work by Strupczewski reported that 3-(1-substituted-4-piperidinyl)-1,2-benzisoxazoles had potent neuroleptic activity based on biological assays suggestive of such activity. *See* J.T. Strupczewski et al., "Synthesis and Neuroleptic Activity of 3-(1-Substituted-4-Piperidinyl)-1-2-Benzisoxazoles," 183rd Annual Meeting of the American Chemical Society, Las Vegas, NV, March 28-April 2, 1982; MEDI Abstract 64 ("Strupczewski Abstract"; Tab 17). Thus, Strupczewksi's work highlighted the fact that compounds containing a 3-(piperidin-4-yl)[1,2]benzisoxazole were potent neuroleptics.

35.    The Strupczewski Abstract outlined the synthetic methodology by which ketoximes of appropriately substituted benzoylpiperidines could be cyclized to prepare 3-1-(substituted)-4-piperidinyl-[1,2]-benzisoxazoles, viz:

In this scheme, Y is Cl, F, or OH. It was well known at the time that ketoxime intermediates could be readily prepared from the corresponding substituted ketones.

12

## VII. The Person of Ordinary Skill Would Have Been Motivated to Modify Pirenperone to Make it Longer-Lasting

36. For the reasons described above, the '870 patent and other prior art pointed to Pirenperone as a lead compound due to its potent antidopamine and antiserotonin activity. Moreover, the fact that Pirenperone had a short duration of activity would have motivated a person of ordinary skill to modify the compound to achieve a longer-lasting agent. Further, recognizing that the benzoyl moiety was known as a site sensitive to metabolic biotransformation (*see* Lindelauf; Pottier, *supra* ¶ 32), the person of ordinary skill would have focused their attention on this portion of the molecule to increase its duration of activity.

37. The teachings in Strupczewski suggested the modification to make to the Pirenperone molecule. Specifically, the person of ordinary skill would have converted the benzoyl moiety containing the keto-group on the "B-side" of Pirenperone to a benzisoxazole.

Pirenperone                    1,2-Benzisoxazole Bioisostere of Pirenperone

38. In doing so, the person of ordinary skill would have expected, based on the teachings of Strupczewski, that the resulting compound would have both potent neuroleptic and antiserotonin activity, thereby providing a compound with a desirable therapeutic profile. In this regard, the person of ordinary skill would have understood that replacement of the 4-(benzoyl)piperidine moiety on Pirenperone with the 1,2-benzisoxazole moiety would be bioisosteric with respect to antipsychotic activity. It would also have been expected that replacement of this moiety, which is susceptible to metabolic transformation, could result in a compound with an increased duration of action.

13

39.     The work of Shutske et al. demonstrated that substituted 1,2-benzisoxazoles were effective bioisosteres for substituted benzoyl moieties. *See* G.M. Shutske et al., "[3-Aryl-1,2-benzisoxazole-6-yl)oxy]acetic Acids. A New Diuretic Series," *J. Med. Chem.* 1982, 25: 36-44 ("Shutske"; Tab 18); Eur. Pat. Appl. EP 2666, published July 11, 1979 ("EP '666"; Tab 19). Prior to the publication of that work, a published patent application had identified several substituted 4-benzoyl substituted phenoxyacetic acids as having promising activity as antihypertensives, diuretics and uricosuric agents. German Patent Application DE 2642879, published April 7, 1977 ("DE '879"; Tab 20). The suitability of the 1,2-benzisoxazole as a bioisostere for the benzoyl moiety was shown when a similar series of substituted 4-(1,2-benzisoxazol-3-yl)phenoxyacetic acids were also identified as promising antihypertensives, diuretics and uricosuric agents. *See* Shutske; EP '666. Representative compounds from the EP '666 patent and DE '879 patent are illustrated below:

[2,3-Dichloro-4-(4-fluorobenzoyl)-phenoxy]acetic acid disclosed in EP '666

7-Chloro-6-[2-(acetic acid)oxy-3-(4-fluorophenyl)-[1,2]-benzisoxazole disclosed in DE '879

40.     Both of these compounds are prepared by treating their respective phenolic intermediates with 2-bromo acetic acid ethyl ester followed by hydrolysis to the acids. The phenolic intermediate A, in fact, serves as the synthetic precursor for the phenolic intermediate B associated with the formation of the [1,2]-benzisoxazole bioisostere.

14

Phenolic Intermediate A                                   Phenolic Intermediate B

41.    Another example of prior art wherein a 1, 2-benzisoxazole was successfully used as a bioisostere for a benzoyl moiety is J.C. Saunders et al., "Potential Antiinflammatory Compounds. 2. Acidic Antiinflammatory 1,2-Benzisoxazoles," *J. Med. Chem.* 1979, 22: 1554-58 ("Saunders"; Tab 21).  That work reports the activity of a ketoprofen benzisoxazole bioisostere.   Ketoprofen is an extensively used nonsteroidal anti-inflammatory agent ("NSAID").  Using synthetic methodology similar to that previously described, the 1,2-benzisoxazole bioisostere of ketoprofen was synthesized and its antiinflammatory activity evaluated:

Ketoprofen                              Ketoprofen Benzisoxazole
                                                Bioisostere

The bioisostere of ketoprofen exhibited somewhat greater activity as an antiinflammatory agent when compared to hydrocortisone and phenybutazone.

15

42.     In short, the studies by Shutske and Saunders suggest to one of ordinary skill in the art that 1,2 benzisoxazole is a suitable bioisostere for the benzoyl portion of Pirenperone. Moreover, the Strupczewski Abstract specifically suggests that replacement of the benzoyl moiety with a 1,2 benzisoxazole could provide a derivative with the structural features associated with antipsychotic activity.

43.     The synthetic methodology for preparing the modified Pirenperone compound was in the prior art at the relevant time. In particular, preparation of a 6-fluoro substituted 1,2-benzisoxazole moiety from a 4-substituted benzoyl piperidin-4-yl moiety was disclosed in United States Patent No. 4,355,037 ("the '037 patent"; Tab 22). Thus, a person of ordinary skill would have been readily able to carry out the modification of the Pirenperone molecule.

44.     The modified Pirenperone compound would have the following structure:

2-Methylpyrido[1,2-a]pyrimidin-4-one          6-Fluoro-3-(piperidin-4-yl)benzisoxazole

Ethyl Linkage

As illustrated, this compound can be viewed as consisting of a 2-methylpyrido[1,2-a]pyrimidin-4-one ("A-side") connected by an ethyl linkage to a 6-fluoro-3-(piperidin-4-yl)benzisoxazole ("B-side"). The "A-side" of this molecule is identical to the "A-side" of the Pirenperone molecule. *See* ¶ 27, *supra*. The "B-side" shares the same structural feature of the N-alkyl 6-flouro-3-(piperidin-4-yl)[1,2]benzisoxazole of the Strupczewski Abstract.

45.     The modified Pirenperone compound (*i.e.*, 3-[2-[4-(6-fluoro-1,2-benzisoxazol-3-yl)-1-piperidinyl]-2-methyl-4H-pyrido[1,2-a]pyrimidin-4-one) is claimed in Janssen's '663 patent, and disclosed in

16

the examples of the '663 patent as Compound 10 *(see* Example 5) and Compound 11 *(see*

Example 6).

Dated: July 22, 2005

_____
Edmond J. LaVoie, Ph. D.

17